UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RAFAEL MORALES,

                    Plaintiff,

      - against -

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-511 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Rafael Morales brings this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), seeking judicial review of the Social Security Administration's ("SSA") denial of his claims for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 14, 18.) For the reasons stated herein, the Court grants Plaintiff's motion and denies the Commissioner's cross-motion.

## BACKGROUND

**I.    Factual and Procedural Background**

Plaintiff was born in October 1960. (Tr. 34.[1]) At the alleged onset of his disability on August 30, 2018, Plaintiff was 57 years old. (Tr. 40, 183, 193.) After graduating from military school, Plaintiff served in the Army for twenty-five years, including five-and-a-half years in active duty. (Tr. 37.) After completing his active military service, Plaintiff began training as an electrician in 1985. (Tr. 40, 75.) Following a four-year apprenticeship, Plaintiff worked as an electrician foreman between 1989 and 1993. (Tr. 40.)

---

[1] All references to "Tr." refer to the consecutively paginated Administrative Transcript (*see* Dkts. 10–12), and not to the internal pagination of the constituent documents.

1

In August 1993, Plaintiff joined the Nassau County Police Department ("NCPD"), where he worked for twenty-five years as a police officer. (Tr. 75, 196.) For eighteen of the years Plaintiff was employed by NCPD, he was a member of its tactical SWAT unit. (Tr. 38.) As a police officer, Plaintiff was cross-trained and had several tasks, including acting as a plainclothes police officer and being the senior sniper within the SWAT unit. (Tr. 38–39.) After the 9/11 attacks, Plaintiff worked on rescue and recovery at the World Trade Center site. (*See* Tr. 45, 592, 598.)

In December 2017, Plaintiff suffered injuries to his jaw, right shoulder, and right hand—his dominant hand—while arresting a violent and intoxicated individual. (Tr. 42, 352.) MRI exams revealed that Plaintiff suffered a "high-grade, nearly full-thickness rotator cuff tear" in his right shoulder and "a longitudinal split tear" in his right bicep tendon. (Tr. 352.) On January 23, 2018, Dr. George Ackerman, an orthopedic surgeon, operated on Plaintiff to address these injuries, but just days later, still "[e]arly in the post-operative period" of recovery, Plaintiff fell down several steps at home, and fell onto his right shoulder. (Tr. 352.) X-rays revealed a clavicle fracture on the right side, and Plaintiff reported "significant pain and tenderness" in that area. (Tr. 352, 377, 378.)

On February 12, 2018, Plaintiff was hospitalized after experiencing upper back pain and shortness of breath, which were later diagnosed as being caused by multiple pulmonary embolisms.[2] (Tr. 461, 521, 535, 593.) After being discharged, Plaintiff continued to receive

---

[2] A pulmonary embolism is a "blood clot that travels through the blood stream, lodges in the pulmonary blood vessels, blocks blood flow to the lungs, prevents acquisition of oxygen and discharge of carbon dioxide, and [can] cause dilation of the heart and deprivation of oxygen to the rest of the body, including the brain." *Arkin v. Gittleson*, 32 F.3d 658, 661 (2d Cir. 1994).

treatment for his pulmonary embolisms, while also undergoing physical therapy for his shoulder injuries. (Tr. 238, 352, 642–92.)

In May 2018, because physical therapy was not improving Plaintiff's condition, Dr. Ackerman performed a distal clavicle resection surgery on Plaintiff to repair the right clavicle.[3] (Tr. 14, 615–16.) Following the surgery, Dr. Ackerman advised Plaintiff that he would be able to return to restricted duty as a police officer on August 15, 2018. (Tr. 353, 658.) However, during a follow-up visit on January 7, 2019, Dr. Ackerman found that Plaintiff's degree of impairment was 100%, and Plaintiff reported mild pain in his right arm and shoulder, and numbness in his right hand. (Tr. 651.) At a follow-up visit with Dr. Ackerman on March 4, 2019, Plaintiff was observed to be experiencing "persistent weakness in his infraspinatus as well as pain in the distal clavicle[.]"[4] (Tr. 353.)

On March 26, 2019, Plaintiff saw Dr. Leon Sultan, an orthopedic and reconstructive surgeon, who examined Plaintiff at the request of Plaintiff's attorney. (Tr. 348.) Dr. Sultan's examination confirmed that while Plaintiff had "reached a point of maximum medical improvement in regard to [his] right shoulder surgery and post-operative therapy," the prognosis as to his right shoulder remained "guarded to poor." (Tr. 350.) Dr. Sultan concluded that Plaintiff's "significant right shoulder motion restriction" will "prevent [Plaintiff] from resuming full unrestricted work activity as a Police Officer." (*Id.*)

---

[3] A distal clavicle resection is "a medical operation performed to ameliorate shoulder pain and discomfort by excising the distal (lateral) end of the clavicle." *McCallister v. Colvin*, No. 14-CV-1488 (TWD), 2016 WL 1122059, at *6 n.5 (N.D.N.Y. Mar. 22, 2016).

[4] The infraspinatus is "a muscle of the shoulder joint, the tendon of which contributes to the rotator cuff." *Hogans v. Comm'r of Soc. Sec.*, No. 19-CV-2737 (SDA), 2020 WL 5496114, at * 7 n.8 (E.D.N.Y. Sept. 11, 2020).

3

Plaintiff's attorney also arranged for Dr. Edward Toriello, who specializes in orthopedic surgery, to examine Plaintiff on April 29, 2019.  (Tr. 361–64.)  Dr. Toriello found that Plaintiff's right shoulder had an abduction and flexion of 90 degrees (as compared to the normal range of 150 to 180 degrees), and internal and external rotation of 45 degrees (normal being 90 degrees), with normal range of extension and abduction.  (Tr. 362.)  Based on his physical examination and review of prior medical records, Dr. Toriello found Plaintiff permanently incapable of returning to work as police officer.  (Tr. 363.)

Plaintiff applied for disability insurance benefits on May 16, 2019, alleging that he had been disabled since August 30, 2018.  (Tr. 10, 183.)  Several days later, Plaintiff returned to Dr. Ackerman for a follow-up appointment.  (Tr. 646.)  Dr. Ackerman determined that Plaintiff's right shoulder was found to reach 45 degrees on external rotation, and he further assessed a 30% loss of use of the right shoulder, 10% each of which was caused by the lack of external rotation, the distal clavicle fracture, and the effects of the distal clavicle surgery.  (Tr. 646.)

In July 2019, consultative internist Dr. Kanista Basnayake evaluated Plaintiff, upon the SSA's request.  (Tr. 592–96.)  Dr. Basnayake reviewed Plaintiff's daily activities, which included shopping two to three times a week with his wife, dressing and washing himself, cooking one to two times a week as needed, and socializing.  (Tr. 593.)  Dr. Basnayake found Plaintiff suffered from elevated blood pressure, right shoulder pain with limitation of movement, sleep apnea, gastroesophageal reflux disease, esophagitis, and hypothyroidism.  (Tr. 595.)  Dr. Basnayake concluded that Plaintiff had moderate to marked limitations for carrying, lifting, pushing, pulling, and overhead reaching, and that Plaintiff should not operate heavy machinery.  (Tr. 595–96.)

State Agency medical consultants evaluated Plaintiff in July 2019 and August 2019.  (Tr. 64–78, 80–94.)  Both medical consultants determined that Plaintiff could lift 20 pounds

4

occasionally and 10 pounds frequently, and could sit, stand, or walk six hours of an eight-hour workday. (Tr. 73, 89–90.) They also found that Plaintiff could never lift or reach overhead with his right arm, and that Plaintiff should avoid operating machinery or driving. (Tr. 73, 90.)

Plaintiff's application for disability insurance benefits was initially denied on July 15, 2019, and reconsideration was denied on September 10, 2019. (Tr. 10.) Plaintiff then requested a video hearing on October 2, 2019. (Tr. 10.) Prior to that hearing, orthopedic surgeon Dr. Michael Miller conducted an Independent Medical Examination of Plaintiff on October 16, 2019, reporting that, despite improvement in his right shoulder, Plaintiff's shoulder suffered from pain and stiffness. (Tr. 296–98.) Dr. Miller diagnosed Plaintiff with 50% permanent loss of use of his right arm, with "40% [] assessed for the range of motion deficits" and the remaining 10% as a result of the "distal clavicle resection" surgery that he underwent in May 2018. (Tr. 297.)

On March 15, 2020, Plaintiff appeared with his attorney, and testified before Administrative Law Judge ("ALJ") David Tobias. (Tr. 28.) Vocational Expert ("VE") Esperanza Distefano also testified at the virtual hearing. (Tr. 47–62.) By decision dated May 28, 2020, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act") from August 30, 2018, his alleged onset date, through the date of the ALJ's decision. (Tr. 10–20.) Plaintiff's request for a review of the ALJ's decision was denied by the Appeals Council on November 25, 2020. (Tr. 1–6.) Plaintiff timely commenced this action on January 29, 2021.[5]

---

[5] According to 42 U.S.C. § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to [her] of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at


## II.     The ALJ's Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).[6] First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If the answer is yes, the plaintiff is not disabled. *Id.* If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment. *Id.* § 416.920(a)(4)(ii). An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities." *Id.* § 416.922(a). If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled. *Id.* § 416.920(a)(4)(ii). But if the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether it meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). *Id.* § 416.920(a)(4)(iii); *see also id.* Pt. 404, Subpt. P, App'x 1. If the ALJ determines at step three that the plaintiff has an impairment that meets or equals one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act. *Id.* § 416.920(a)(4)(iii). On the other hand, if the plaintiff does not have a such an impairment, the ALJ must determine the plaintiff's residual functional capacity ("RFC") before continuing on to

---

\*3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). The final decision was issued November 25, 2020 (Tr. 1), and the Complaint was filed on January 29, 2021 (Complaint, Dkt. 1), 60 days after the presumed receipt date of the decision, rendering this appeal timely.

[6] Some of the cases cited herein involve supplemental security income ("SSI") regulations, while this case involves DIB, but the DIB and SSI regulations are "virtually identical." *Canter v. Saul*, No. 19-CV-157 (KAD), 2020 WL 887451, at \*1 n.2 (D. Conn. Feb. 24, 2020). The DIB regulations are found at 20 C.F.R. § 404.900 *et seq.*, while the parallel SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*

steps four and five. To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." *Id.* § 416.945(a)(1). The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work. *Id.* § 416.920(a)(4)(iv). If the answer is yes, the plaintiff is not disabled. *Id.* Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. *Id.* § 416.920(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

Here, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 30, 2018, the onset date. (Tr. 12.) At step two, the ALJ determined that Plaintiff had the "following severe impairments: right shoulder derangement, right carpal tunnel syndrome, and sleep apnea." (Tr. 12.) The ALJ determined that Plaintiff's other alleged physical impairments, including gastroesophageal reflux disease, esophagitis, and left carpal tunnel syndrome were not sufficiently severe as to satisfy the step two criteria. (Tr. 12.) The ALJ also determined that Plaintiff's alleged anxiety disorder and jaw problems were not "medically determinable impairments" due to a "lack of objective evidence." (Tr. 12.)[7] At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the listed

---

[7] In July 2019, Plaintiff was examined by consultative psychologist, Dr. Paul Herman, PhD. (Tr. 598–601.) Plaintiff reported being diagnosed with anxiety as a result of his time working at the World Trade Center site after 9/11, and also in connection with his time in the military and as a member of NCPD. (Tr. 598.) Dr. Herman found no evidence that Plaintiff was suffering any limitation with respect to his ability to understand and apply simple directions and instructions, use reason and judgment, sustain concentration, maintain regular attendance, and maintain his well-being or interact adequately with the general public, and that Plaintiff was not taking medication for mental health issues. (Tr. 599–600.)

7

impairments in the Listings. (Tr. 13.) The ALJ then determined Plaintiff's RFC as follows: "the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except that the claimant is limited to work that does not require overhead reaching or lifting with the right arm, and otherwise no more than occasional lifting and reaching with the right arm in other directions."[8] (Tr. 13.) The ALJ also noted that Plaintiff "is limited to no more than occasional handling with the right hand and limited to work that does not involve driving, operating dangerous machinery, or exposure to unprotected heights. (Tr. 13.) At step four, the ALJ concluded that due to his severe impairments, Plaintiff could not perform his past work as a police officer. (Tr. 18.) As part of the step five analysis, the ALJ found—relying on the VE's testimony—that Plaintiff had acquired the following transferrable skills from his work as a police officer: "law enforcement skills including training in specialized weapons and tactics, skills involving police procedure and policy, clerical skills, telephone / dispatch skills, and negotiation / persuasion skills." (Tr. 18.) The ALJ then found that there were other jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically identifying gate guard, bailiff, and security guard as jobs that Plaintiff could perform. (Tr. 19.) The ALJ thus concluded that Plaintiff was not disabled. (Tr. 19.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 405(g);

---

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b).

8

42 U.S.C. § 1383(c).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (internal quotation marks and brackets omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  In determining whether the Commissioner's findings were based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (*per curiam*).  A reviewing court applies the "substantial evidence" standard to a Commissioner's determination in step five as to whether and which skills a claimant acquired in a previous job are transferable to jobs that claimant can perform in light of his or her RFC. *See Draegert v. Barnhart*, 311 F.3d 468, 473 (2d Cir. 2002) (remanding because ALJ's determination that plaintiff had acquired transferable work skills enabling him to perform substantial gainful activity was not supported by "substantial evidence").

## DISCUSSION

**I.      Plaintiff's Challenge to the ALJ's decision**

Plaintiff contends that the ALJ committed reversible errors of law and fact in the analysis of transferability of Plaintiff's skills.  (Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mot."), Dkt. 14-1, at 9.)  According to Plaintiff, the ALJ failed to apply "established case law" on

9

the issue of what constitutes a "skill" acquired in a previous occupation, as opposed to an individual's natural aptitude or trait. (*Id.* at 10.) The Court agrees, and finds that the ALJ's analysis on transferability of skills was not supported by "substantial evidence." *See Draegert*, 311 F.3d 468.

II.     **Transferability of Skills**

An ALJ must apply "special rules" when determining whether a person who is of advanced age is "disabled" under the Act. *Biernacki v. Colvin*, No. 15-CV-331 (FPG), 2016 WL 4925850, at *5 (W.D.N.Y. Sept. 16, 2016). Specifically, 20 C.F.R. 404.1568 provides that:

> If you are of advanced age (age 55 or older), and you have a severe impairment that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that can transfer to other skilled or semiskilled work . . . that you can do despite your impairment(s).

§ 404.1568(d)(4). Accordingly, "a claimant of advanced age who is at least a high school graduate, who previously held a skilled or semi-skilled job that he can no longer perform but who has the [RFC] to perform light work, is not to be found disabled if he has job skills that are transferable[,] but must be found disabled if he does not." *Draegert*, 311 F.3d at 473.

As further explained in *Draegert*, the ALJ must identify the skills that the claimant has acquired that are transferrable to specific tasks required by other jobs, so as to distinguish them from "traits or attributes" that are not task-related abilities and do not support a finding that the claimant can perform other substantial gainful work in the national economy. *Id*. at 476. However, neither the Act nor its regulations provide the definition of "skills" as opposed to natural "aptitudes" or "traits." *Draegert*, 311 F.3d at 471. In *Draegert*, the Second Circuit explained the difference between skills and aptitudes by endorsing the guidance provided in a Social Security Ruling that a "skill" is "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through

10

performance of an occupation which is above the unskilled level." *Id.* at 473 (citing Social Security Ruling 82-41, *Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations*, 1982 WL 31389, at *1 (S.S.A. Feb. 27, 1979)).  By contrast, an "aptitude" is "an inclination, a natural ability, talent or capacity for learning." *Id.* at 475 (citing *Weaver v. Secretary of Health & Hum. Servs.*, 722 F.2d 310, 311–12 (6th Cir. 1983)).

To define the term "transferability", the court in *Draegert* again referred to the regulations, which provide:

> We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

§ 404.1568(d)(1); *see also Draegert*, 311 F.3d at 473.

Therefore, in accordance with 20 C.F.R. § 404.1568(d)(4), the ALJ must articulate the vocational skills the claimant acquired from past employment with "sufficient specificity" in order for courts are to "decide whether the determination is supported by substantial evidence." *Clark v. Berryhill*, 697 F. App'x 49, 52 (2d Cir. 2017) (citing *Draegert*, 311 F.3d at 472–77).  One way the ALJ can satisfy his obligation to make "sufficiently specific findings" about the transferability of skills to other jobs in the national economy is by "'link[ing]' the skills found by the VE to a 'particular task' that is specific to the performance of the other jobs that the VE recommends." *Higgs-Wilson v. Saul*, No. 17-CV-768 (LJV), 2019 WL 2537296, at *4 (W.D.N.Y. June 20, 2019) (quoting *Draegert*, 311 F.3d at 476).  Thus, in making a finding that skills are transferrable, the ALJ and VE must not "'phrase' the claimant's transferable skills 'so vaguely' that they might 'apply to jobs that are vastly different from the claimant's past relevant work.'" *Higgs-Wilson*, 2019 WL 2537296, at * 5 (quoting *Biernacki*, 2016 WL 4925850, at *5)).  Put differently, the ALJ must "analyze the skills' transferability as they related to the jobs for which the VE found

11

[Plaintiff] was suited." *Ruiz v. Berryhill*, No. 15-CV-1059 (ENV), 2018 WL 4047204, at *13 (E.D.N.Y. July 24, 2018) (cleaned up). Otherwise, as the *Draegert* court explained, "abilities, when not linked to any particular tasks are merely traits or aptitudes, not jobs skills." 311 F.3d at 476.

**III. Application**

In the instant case, the ALJ's determination of transferability of skills was not supported by substantial evidence because the VE and ALJ failed to state with sufficient specificity the skills that Plaintiff had acquired as a member of NCPD and its SWAT unit. At the hearing, the VE testified that Plaintiff had "extensive skills that can be transferable." (Tr. 50.) Specifically, the VE identified Plaintiff's "service orientation skills dealing with the public"; "extensive[] knowledg[e] about police procedure policies"; "clerical skills transferrable across all industry lines," which was "used when writing reports"; "telephone skills and dispatching skills"; "communicating with others"; "skills in dealing with all kinds of people"; "skills in negotiation and persuasion"; and finally, "skills in being aware of other's reactions and understanding social perceptiveness." (Tr. 49–50.) Regarding these purported skills, the ALJ asked whether "they also [would] be transferrable to jobs in which there would be little, if any[,] vocational adjustment?" (Tr. 50.) The VE answered that gate guard, bailiff, and security guard are three jobs to which these skills would be transferrable. (Tr. 51–52.)[9] Yet, the ALJ never asked about, and the VE never explained, the "link" between any of these vaguely-phrased "skills" or the particular tasks of these occupations that correspond to these skills. *See Higgs-Wilson*, 2019 WL 2537296, at *4.

---

[9] The VE initially identified private investigator as one of the jobs to which the identified skills would be transferrable, but retracted that suggestion after the ALJ questioned whether any of those jobs would require driving. (Tr. 50–51.)

12

Plaintiff argues that the skills identified by the VE are "much more akin to the unskilled tasks," or "aptitudes that [P]laintiff inherently possessed." (Pl. Mot., Dkt. 14-1, at 12, 13.) At least with respect to the ability of "communicating with others" and "skills in being aware of other's reactions and understanding social perceptiveness," the Court agrees that, under the applicable case law, that these "skills" are too vaguely worded to be skills, as opposed to aptitudes. *See Gittens v. Astrue*, No. 07-CV-1397 (GAY), 2008 WL 2787723, at *8 (S.D.N.Y. June 23, 2008) (finding that a former police officer claimant's communication "skills" are actually his personal "attributes," given that the vocational expert made "no attempt to connect [his ability to communicate] to specific work activities"); *see also Biernacki*, 2016 WL 4925850, at *5 (finding that "ability to communicate with others" is too vague to be a skill).

Whether the remaining skills identified by the VE are in fact transferrable skills, depends on whether these skills "apply to the specific, industry-related contexts" identified by the VE and ALJ. *See Higgs-Wilson*, 2019 WL 2537296, at *6 (citations omitted). As the recapitulation above of the VE's testimony makes clear, this did not happen. Rather than link any of the abilities ascribed to Plaintiff to particular tasks that a security guard, gate guard, or bailiff must perform, the VE simply reiterated the various codes for the three occupations found in the Dictionary of Occupational Titles, and grouped the three occupations along with Plaintiff's prior job as being in the same "protective industry." (*See* Tr. 56.) Nowhere in the VE's testimony does he apply Plaintiff's purported skills to specific tasks performed in the potential occupations identified by the VE.[10]

---

[10] To his credit, the ALJ in his decision, reformulated the skills the VE outlined into the following more organized categories: (1) "law enforcement skills including training in specialized weapons and tactics"; (2) "skills involving police procedure and policy"; (3) "clerical skills"; (4) "telephone/dispatch skills"; and "(5) negotiation/persuasion skills." (Tr. 18; *see also* Tr. 49–50.) But even after rephrasing the skills, the ALJ also failed to link these skills to tasks that one could

13

Of the remaining skills, courts have found that one's ability to write an incident report or having knowledge of law and law enforcement regulations could be transferrable skills. *See, e.g.*, *Gittens*, 2008 WL 2787723, at *8 (finding plaintiff's "knowledge and experience of routines of complex investigation" and "ability to compute and develop reports" were transferable skills learned by plaintiff during the course of his job as a police officer); *John S. v. Kijakazi*, No. 20-CV-1468 (GTS), 2022 WL 866548, at *11 (N.D.N.Y. Mar. 23, 2022) (finding plaintiff's "report writing" skills and "knowledge of laws and regulations" were transferable skills). However, here the VE and ALJ neither specifically described the purported skills Plaintiff had acquired nor linked them to tasks that the three prospective jobs required performance of. Because the failure to articulate this link "effectively negate[s]" the "presumption" found in 20 C.F.R. § 404.1568(d)(4) that a person of advanced age without transferable skills is disabled, the ALJ's determination at step five was not supported by substantial evidence. *Draegert*, 311 F.3d at 475 (quoting *Weaver*, 722 F.2d at 312).

On remand,[11] the ALJ should hear testimony from a VE regarding the transferrable skills that Plaintiff possesses and to "link" any purportedly transferrable skills to the "particular tasks" that are specific to the other jobs that the VE recommends. *See Higgs-Wilson*, 2019 WL 2537296, at *4.

---

anticipate a bailiff, security guard, or gate guard to perform. Thus, the ALJ still "fell well short of providing any indication that, as enhanced by [Plaintiff's] prior work, those abilities were transferrable to the . . . specific jobs that [the] ALJ found [Plaintiff] had the residual functional capacity to perform." *Draegert*, 311 F.3d at 476.

[11] The Commissioner should also consider on remand how Plaintiff's "long work history of [over] 30 years" factors into the ALJ's assessment of Plaintiff's credibility regarding the severity of his impairments and whether he can work. *See Bradley v. Colvin*, 110 F. Supp. 3d 429, 447 (E.D.N.Y. 2015); *see also Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.")

## CONCLUSION

For the reasons explained above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Memorandum & Order. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2022
Brooklyn, New York